AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
District of Colorado

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and addres*s)<br><br>Two Apple iPhone cellular telephones one described as a black in color Apple iPhone cellular telephone and one described as a blue in color apple iPhone cellular telephone  held in evidence and associated with Homeland Security Investigations case GJ13WS21GJ0001 currently stored in Homeland Security Investigations Evidence Room and more fully described in Attachment A, attached hereto. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No. 21-sw-00572-GPG |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the ___State and___ District of ___Colorado___ *(identify the person or describe property to be searched and give its location)*:

**SEE "ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit
The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

**SEE "ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit
The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

      X evidence of a crime;

      X contraband, fruits of crime, or other items illegally possessed;

      X property designed for use, intended for use, or used in committing a crime;

      ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of 21 U.S.C. §§ 841 (a)(1) and (b)(1)(A)(viii), and the application is based on these facts:

      X Continued on the attached affidavit, which is incorporated by reference.

      ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*s/Shane Gosnell*                 .
*Applicant's signature*

Shane Gosnell, SA
*Printed name and title*

Sworn to before me and:    ☐ signed in my presence.
                   ☒ submitted, attested to, and acknowledged by reliable electronic means.

Date: ___5/19/2021___

                                                                     
*Judge's signature*

City and state: ___Grand Junction, CO___        ___Gordon P. Gallagher-USMJ___
                                                                      *Printed name and title*

## AFFIDAVIT

I, Shane Gosnell, being duly sworn, hereby depose and state that the following is true to the best of my information, knowledge, and belief:

## INTRODUCTION AND AGENT BACKROUND

1.      I am a Special Agent with Homeland Security Investigations ("HSI") and have been so employed since January 2019.  I am currently assigned to the Denver Division of HSI and assigned to the Grand Junction Resident Agent (RAC) Office.  Prior to being employed by Immigration and Customs Enforcement / Homeland Security Investigations, I was employed for approximately eight years as a Trooper with the Colorado State Patrol (CSP) and Peace Officer in the State of Colorado.  The last four of my years with CSP, I was assigned to the Criminal Investigations Branch.  Three of the four years as an interdiction trooper and the last year as a K-9 handler.  My job functions included interdicting and investigating cases involving various Colorado Revised Statute Title 18 violations, specifically investigations involving the unlawful transportation and distribution of controlled substances.  This included fact finding, interviewing/interrogation, report writing, evidence processing, affidavits preparation for search/arrest warrants and arrests.  I was Title 19 designated by HSI and a task force officer.  As part of my daily duties as an HSI agent, I have the authority to investigate and enforce violations of various titles of the United States Code, to include Title 8 (Aliens and Nationality), Title 18 (Crimes and Criminal Procedure), Title 19 (Customs), Title 21 (Food and Drugs), and Title 31 (Money and Finance).

2.      I have conducted and participated in criminal investigations involving complex criminal networks involved in money laundering, smuggling, and drug trafficking violations resulting in arrests and seizures.  I am familiar with the methods employed by drug smuggling

1

and money laundering organizations to conduct their business, including, but not limited to:  (1) methods of importing and distributing narcotics; (2) transportation routes used for importing and distributing narcotics; and, (3) the means of coordinating supply organizations used to smuggle narcotics across the United States border and throughout the country.

3.      This affidavit is submitted in support of an application for a search warrant for two cellular phones (more fully described in Attachment A), and the data located therein, there being probable cause to believe that located in the place described in Attachment A are items described in Attachment B, being evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections  841(a)(1) and (b)(1)(A)(viii) – Possession with intent to distribute methamphetamine.  .

4.      Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections  841(a)(1) and (b)(1)(A)(viii) are located in the places described in Attachment A.

5.      The information contained within the affidavit is based on my training and experience, as well as information imparted to me by other law enforcement officers involved in this investigation.

## IDENTIFICATION OF THE DEVICE(S) TO BE EXAMINED

6.      Multiple items are held in evidence at the HSI Office Evidence Room in Grand Junction, Colorado, which were discovered in the possession of Rodolfo MANJARREZ-LOPEZ and seized incident to arrest.  They are all being held in evidence under case number GJ13WS21GJ0001.  As pertinent here, the items include (1) an Apple iPhone cellular telephone

black in color and (2) an Apple iPhone cellular telephone blue in color, hereinafter and in

Attachments A and B the "Device(s)."

7.      There is probable cause to believe that the Device(s) are or contain evidence,

fruits, and instrumentalities of violations of Title 21, United States Code, Sections  841(a)(1) and

(b)(1)(A)(viii).  The applied-for warrant would authorize the forensic examination of the

Device(s) for the purpose of identifying electronically stored data particularly described in

Attachment B.

8.      The Device(s) are currently in the lawful possession of HSI.  They came into

HSI's possession in the following way:

A.      The devices were discovered after troopers with the Colorado State Patrol

conducted a traffic stop and a consent search of a 2015 Kia Soul. The search revealed

thirteen packages of suspected methamphetamine weighing approximately thirteen

pounds hidden in an aftermarket manufactured compartment in the floor of the vehicle.

The occupants of the vehicle cooperated. Agents with the cooperation of the occupants of

the Kia Soul conducted a controlled delivery of the vehicle and methamphetamine. The

individuals communicated through a cellular phone application "Threema" and

approximately thirty minutes after the cooperating defendant made notification the

vehicle was parked at the planned destination two males arrived and tried to depart in the

Kia Soul. Law enforcement conducting surveillance placed the two males into custody.

The cell phones were seized from one of the males' search incident to arrest.

B.      Therefore, while I might already have all necessary authority to examine

the Device(s), I seek this warrant out of an abundance of caution to be certain that an

examination of the Device(s) will comply with the Fourth Amendment and other applicable laws.

9.      The Device(s) are currently in storage at the HSI office located at, 571 South Commercial Drive, Grand Junction, CO 81505.  In my training and experience, I know that the Device(s) all have been stored in a manner in which the contents are, to the extent material to this investigation, in substantially the same state as they were when the Device(s) first came into HSI's possession.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

10.      Based on my training and experience, I know about the following items:

A.      A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet including websites, social media sites, bulletin boards, file sharing, and other Internet sites.  Wireless telephones often have a subscriber identity module or subscriber identification module ("SIM"), which is an

integrated circuit that securely stores the International Mobile Subscriber Identity

("IMSI") and the related key used to identify and authenticate subscribers on mobile

telephone devices.  A SIM is embedded into a removable "SIM card," which can be

transferred between different mobile devices.  A SIM card contains a unique serial

number ("ICCID"), IMSI, security authentication and ciphering information, temporary

information related to the local network, a list of the services to which the user has

access, and certain passwords.  Most SIM cards will also store certain usage data, such as

call history, text ("SMS") messages, and phone book contacts.  Wireless telephones may

also be "smartphones," such that they operate as personal computers capable of accessing

the Internet.  They may also include GPS technology for determining the location of the

device.  Such telephones may also contain removable storage media, such as a flash

card—such devices can store any digital data, and can have the capacity to store many

gigabytes of data.  Some cellular telephones also have software, giving them the same

capabilities as personal computers including accessing and editing word processing

documents, spreadsheets, and presentations.  Some cellular telephones also operate as a

"tablet," or mobile computer, and can contain software programs called applications.

Those programs can perform different functions and save data associated with those

functions, including use associated with the Internet.

      B.     Computers and digital storage devices can include all types of electronic,

magnetic, optical, electrochemical, or other high speed data processing devices

performing logical, arithmetic, or storage functions, including desktop computers, laptop

computers, mobile phones, pagers, tablets, server computers, game consoles, and network

hardware and also includes any physical object upon which computer data can be

recorded such as hard disk drives, RAM, floppy disks, flash memory, CDs, DVDs, and other magnetic or optical media.

11.     Based on my knowledge, training, and experience, I know that computers and digital storage devices can store information for long periods of time.  Similarly, things that have been searched for and viewed via the Internet are typically stored for some period of time on a device.  This information can sometimes be recovered with forensic tools.

12.     Based on my knowledge, training, and experience, examining data stored on computers and digital storage devices can uncover, among other things, evidence that reveals or suggests who possessed or used the computer or digital storage devices.

13.     There is probable cause to believe that things that were once stored on the Device(s) may still be stored there, for at least the following reasons:

A.     Based on my knowledge, training, and experience, I know that digital files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a digital storage device or computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

B.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition,

a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

C.      Wholly apart from user-generated files, computer storage media including digital storage devices and computers' internal hard drives can contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

D.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  Forensic review may also disclose when and by whom the Internet was used to conduct searches, view material, and communicate with others via the Internet.

14.     *Forensic evidence*.  As further described in Attachment B, this application seeks permission to locate not only electronically stored information on the Device(s) that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device(s) were used, the purpose of the use, who used the Device(s), and when.  There is probable cause to believe that this forensic electronic evidence might be on the Device(s) because:

A.      Data on the storage medium can provide evidence of a file that was once on the storage media but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory

paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer or device was in use.  Computer file systems can record information about the dates files were created and the sequence in which they were created.  This information can be recovered months or even years after they have been downloaded onto the storage medium, deleted, or viewed.

B.     Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

C.     A person with appropriate familiarity with how a digital storage device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

D.     The process of identifying the exact electronically stored information on storage media that are necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer or digital storage device and the application of knowledge about how a computer or digital storage device behaves.

Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

E.      Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

F.      I know that when an individual uses an electronic device to aid in the commission of a crime, particularly drug trafficking, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The electronic device is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: saved communications providing instructions to the drug courier; names, telephone numbers, e mail addresses, photographs, social media accounts and messages of co-conspirators; as well as information about how the device was used; data that was sent or received; and other records that indicate the nature of the offense. Additionally, these devices may contain financial account information, financial log books and browser histories.  In my experience, drug couriers make multiple trips.  A search of the devices may also provide information on travel history through hotel reservations confirmation e-mails, route searches through websites such as Google Maps, or location information stored by the device itself.

G.      I also know that those who engage in criminal activity will attempt to conceal evidence of the activity by hiding files, by renaming the format, (such as saving a

.pdf image file as a .doc document file) or by giving them deceptive names such that it is necessary to view the contents of each file to determine what it contains.

      H.     A single compact disk can store dozens of images and hundreds of pages of text.  The size of the electronic storage media (commonly referred to as a hard drive) used in home computers has grown tremendously within the last several years.  Thumb drives and flash cards with capacities of 32 gigabytes and larger are not uncommon. Hard drives with the capacity of 500 gigabytes up to 3 terabytes are not uncommon. These drives can store thousands of images and videos at very high resolution.  Magnetic storage located in host computers adds another dimension to the equation.  It is possible to use a video camera to capture an image, process that image in a computer with video capture capabilities, and save that image to storage in another country.  Once this is done, there is no readily apparent evidence at the "scene of the crime."  Only with careful laboratory examination of electronic storage devices is it possible to recreate the evidence trail.

      15.    *Need to review evidence over time and to maintain entirety of evidence.*  I recognize the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this Affidavit and in Attachment B in order to prevent unnecessary invasion of privacy and overbroad searches.  I advise it would be impractical and infeasible for the Government to review the mirrored images of digital devices that are copied as a result of a search warrant issued pursuant to this Application during a single analysis.  I have learned through practical experience that various pieces of evidence retrieved from digital devices in investigations of this sort often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid,

active, and ongoing investigation of the whole as it develops.  In other words, the weight of each individual piece of the data fluctuates based upon additional investigative measures undertaken, other documents under review, and incorporation of evidence into a consolidated whole. Analysis is content-relational, and the importance of any associated data may grow whenever further analysis is performed.  The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in sum.  Due to the interrelation and correlation between pieces of an investigation as that investigation continues, looking at one piece of information may lose its full evidentiary value if it is related to another piece of information, yet its complement is not preserved along with the original.  In the past, I have reviewed activity and data on digital devices pursuant to search warrants in the course of ongoing criminal investigations.  I have learned from that experience, as well as other investigative efforts, that multiple reviews of the data at different times is necessary to understand the full value of the information contained therein, and to determine whether it is within the scope of the items sought in Attachment B.  In order to obtain the full picture and meaning of the data from the information sought in Attachments A and B of this application, the Government would need to maintain access to all of the resultant data, as the completeness and potential of probative value of the data must be assessed within the full scope of the investigation.  As such, I respectfully request the ability to maintain the whole of the data obtained as a result of the search warrant, and to maintain and to review the data in the control and custody of the Government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at one time.  As with all evidence, the Government will maintain the evidence and mirror images of the evidence in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

16.     *Nature of examination*.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, copying and reviewing the contents of the Device(s) consistent with the warrant.  The warrant I am applying for would authorize a later examination and perhaps repeated review of the Device(s) or information from a copy of the Device(s) consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Device(s) to human inspection in order to determine whether it is evidence described by the warrant.

## INVESTIGATION

17.     On February 25, 2021, at approximately 1036 hours, CSP Trooper's Connor Aydt and Christian Bollen (two-man patrol car) initiated a traffic stop on the driver of a white, Kia Soul SUV bearing a California registration for following too closely where prohibited by Colorado law.

A.     This stop occurred off the Interstate 70 Milepost 19 east bound exit, in the parking lot of El Tapatio located at 402 Jurassic Avenue #3, Fruita, CO 81521 in Mesa County, the State of Colorado.  Troopers observed the vehicle while sitting stationary in an emergency crossover on Interstate 70 at approximate milepost 17.  Shortly after pulling out of the crossover Troopers observed the driver of the Kia Soul traveling approximately one and a half seconds behind the rear of a box truck. Troopers estimated the distance between the rear of the box truck and the front of the Kia by using a delineator post on the shoulder of the roadway. The posted speed limit at the observed location was 75 MPH.  Colorado law states the driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the

speed of such vehicles and the traffic upon and the condition of the highway. Troopers observed the SUV was occupied by a male driver and female passenger. Troopers noted the occupants were staring straight ahead, appeared to avoid looking at law enforcement and appeared to be speaking with each other out of the corners of their mouths. Troopers conducted a check of the vehicles license plate through multiple databases. Troopers learned the vehicle had traveled east bound through the area a month prior on 1/21/21 at approximately 0638 hours and back west bound through the area at 1838 hours on the same date. Although the traffic violation provided Troopers with the requisite reasonable suspicion to stop the vehicle, the occupant's behaviors and the recent travel heightened the troopers suspicion of criminal activity.

B.      Upon contact with the SUV, the occupants were identified by their California driver's licenses as Jonathan Alfredo GONZALEZ Y.O.B. 1988 (driver) and Yecenia RAMIREZ Y.O.B. 1979 (passenger). During the course of the traffic stop, Troopers observed several additional factors causing them to become highly suspicious GONZALEZ and RAMIREZ were involved in criminal activity. The occupants gave conflicting information regarding the owner of the vehicle and the length of travel. Troopers learned the vehicle had recently been purchased, had made a cross-country trip after its purchase a month prior and had recently crossed the Mexico/United States border.

C.      Troopers concluded the traffic violation portion of the traffic stop. Troopers then asked GONZALEZ for consent to search the vehicle. GONZALEZ verbally consented to a search of the vehicle. During this search, Troopers located an aftermarket manufactured compartment under the front seats of the vehicle. The

compartments were accessed, and 13 packages of suspected methamphetamine were located in the passenger side compartment.  The 13 packages had a gross weight of approximately 13 pounds.  The packages contained a crystalline substance which field tested presumptive positive for methamphetamine.

       D.       GONZALEZ and RIVERA were arrested and transported to the Homeland Security Investigations Grand Junction, CO office. GONZALEZ and RIVERA were advised of their Miranda Rights. GONZALEZ and RIVERA stated they understood their rights. GONZALEZ and RIVERA were provided ICE Form 73-025 "Statement of Rights/Waiver". GONZALEZ and RIVERA both signed the waiver and agreed to answer questions without an attorney present.

       E.       Agents with Homeland Security Investigations interviewed GONZALEZ. GONZALEZ stated during the interview RAMIREZ was his girlfriend and had no knowledge of the drugs. GONZALEZ explained he frequently traveled to Bombay Beach Club located in Rosarito, Mexico to socialize. GONZALEZ stated he met a male known to him as Juan. GONZALEZ advised he had mentioned to Juan he was in need of money. GONZALEZ stated Juan approached him about being paid to drive and drop off vehicles. GONZALEZ explained he believed there were probably drugs in the vehicle based on his encounters with Juan. GONZALEZ stated he initially told Juan he was not interested. GONZALEZ advised he later took Juan up on the offer. GONZALEZ stated Juan was in Mexico. GONZALEZ explained the trip was on behalf of/at the direction of Juan. GONZALEZ advised he was communicating with Juan through the cellular phone application "Threema".

F.      Agents learned "Threema" is a paid open-source end-to-end encrypted instant messaging application for iOS and Android. The software is based on the privacy by design principles as it does not require a phone number or any other personally identifiable information. This helps anonymize the users. In addition to text messaging, users can make voice and video calls, send multimedia, locations, voice messages, and files. Agents also learned there is a web app version, "Threema Web", can be used on desktop devices, but only as long as the phone with the "Threema" installation of the user is online.

G.      GONZALEZ advised he was being paid one thousand dollars to make the trip. GONZALEZ explained he was to drop the vehicle off at a restaurant named "Mariscos El Rey" #3 located at 6026 W Alameda Avenue, Lakewood, CO 80226.

H.      Agents with HSI requested and obtained written consent to search GONZALEZ's phone. Agents located the "Threema" cellular phone application and the conversation identified by GONZALEZ as being between him and Juan. The conversation was the only conversation within the application. The conversation was identified by a purple in color "smiling devil" emoji. SA Gosnell had GONZALEZ open the conversation. The conversation contained two messages intended for GONZALEZ. The first was a "hand waving" emoji on February 25, 2021 time stamped 11:37. The second message was also a "hand waving" emoji time stamped 12:26. SA Gosnell asked GONZALEZ if he deleted the messages after communicating to Juan. GONZALEZ advised he believed the application automatically deleted the messages after a period of time. SA Gosnell asked GONALEZ if Juan gave any specific instructions for making the trip. GONZALEZ explained he was only told to drive safe. GONZALEZ stated he

checked in via the "Threema" application approximately two hours prior to being stopped. GONZALEZ advised in his last communication he told Juan LNU he was approximately four hours from Denver.

       I.      GONZALEZ agreed to cooperate and further the case. Agents with HSI made arrangements to attempt a controlled delivery based on the direction of who was believed to be Juan "Last Name Unknown" identified in the "Threema" conversation.

       J.      GONZALEZ under the supervision of agents with HSI reengaged Juan in conversation through the "Threema" application. GONZALEZ confirmed "Mariscos El Rey" #3 located at 6026 W Alameda Avenue, Lakewood, CO 80226 was the location he was to leave the Kia Soul CA# 8MHD540. GONZALEZ advised Juan he had fallen asleep and was back in route to the location with an estimated time of arrival of 2200 hours on February 25, 2021.

       K.      A controlled delivery strategy was implemented where two packages of suspected methamphetamine would be left in the Kia Soul (passenger side compartment under the seat) bearing California license plates 8MHD540. GONZALEZ would park the Kia Soul on the west side of the restaurant (Mariscos El Rey), GONZALEZ would send a message to Juan LNU via the "Threema" application advising he was at the location and would be departing via an Uber. Law enforcement would maintain surveillance at the location until the vehicle was picked up. Law enforcements goal was to identify individuals arriving at the location to pick the Kia Soul up and take any individual into custody who attempted to take the Kia Soul and two packages (approx. 921.9 grams) of suspected methamphetamine.

L.      At approximately 10:00 P.M. GONZALEZ parked the Kia Soul bearing California license plates 8MHD540 on the west side of "Mariscos El Rey" located at 6026 W Alameda Avenue Lakewood, CO. GONZALEZ advised Juan LNU through the "Threema" application he was at the restaurant. At approximately 10:04 P.M. GONZALEZ sent a message stating "En el tapete"/on the mat indicating he left the keys under the floor mat of the Kia Soul. At approximately 10:05 P.M. Juan LNU responded "No esperame"/don't, wait for me. Indicating he wanted GONZALEZ to wait. GONZALEZ responded stating "llame un Uber"/I called an Uber. Indicating he had already called an Uber. At approximately 10:06 P.M. Juan LNU responded "Perame poquito'/beat me a little. Indicating GONZALEZ had arrived before the individual/individuals picking the vehicle up. At approximately 10:07 P.M. Juan LNU sent a message stating, "En cual estas"/which are you in? Juan LNU confirmed the location GONZALEZ was at. At approximately 10:08 P.M. GONZALEZ advised Juan LNU "3", "Donde indicaron"/where they indicated, "T lo dejo"/I left it. Indicating he was at "Mariscos El Rey" #3 where he was directed, and he left.

M.      Agents with HSI picked GONZALEZ up from "Mariscos El Rey" and took him to a safe location where communication could be monitored while surveilling the Kia Soul. For officer safety GONZALEZ was directed to keep the keys to the Kia Soul even though he was telling Juan LNU he placed them under the passenger side floor mat.

N.      At approximately 10:09 P.M. Juan LNU responded, "no se laque el carro"/Do not lock the car. Directing GONZALEZ not to lock the car. GONZALEZ responded "no", "la debajo del tapete"/the under the mat. Indicating he did not lock the car and the keys were under a floor mat. Juan LNU responded, "no 20 yega", "okay".

GONZALEZ believed Juan LNU was stating the individual picking up the Kia Soul were twenty minutes away. At approximately 10:10 P.M. GONZALEZ again advised Juan LNU "Llame un Uber"/I called an Uber, "Y regreso cuando ya este"/and return when I am. Indicating he could return later. Juan LNU responded, "okay".

O.      At approximately 10:30 P.M. law enforcement officers conducting surveillance observed a blue in color Nissan Sentra bearing Colorado license plate #BRHH69 occupied by two males enter the parking lot (Mariscos El Rey) and parked just south of the Kia Soul bearing CA license plate 8MHD540. Law enforcement watched as no one initially got out of the vehicle. Law enforcement observed as the driver of the vehicle shut the lights of the vehicle off. Law enforcement observed as the vehicle sat and then a short time later observed as the driver of the vehicle backed the vehicle out of its spot and moved to the north side of the Kia Soul. Officers observed a male passenger exit the front passenger seat of the Nissan Sentra and open the front driver's side door of the Kia Soul with California license plate 8MHD540.

P.      At approximately 10:40 P.M. GONZALEZ received a message in the "Threema" application from Juan LNU stating, "Cual tapete"/which mat? At approximately 10:42 P.M. GONZALEZ responded stating "Pasajero"/passenger.

Q.      Law enforcement observed as the male who had exited the front passenger seat of the Nissan Sentra appeared to be looking under the floor mats of the Kia Soul.

R.      SA Gosnell gave direction to move in and contact the occupants of the Nissan Sentra. Law enforcement observed the passenger of the Nissan Sentra looking under the floor mats of the Kia Soul as they were pulling into the parking lot to contact the individuals. The two males who had arrived in the Nissan Sentra were taken into custody.

The driver of the Nissan Sentra was later identified as Ariel BAUTISTA-ALANIS (DOB: 09/17/1987). BAUTISTA-ALANIS remained in the driver's seat of the Nissan Sentra after arriving at "Mariscos El Rey". BAUTISTAALANIS was given orders to exit the vehicle and was taken into custody. BAUTISTA-ALANIS identified an LG cell phone with a cracked screen inside the Sentra as belonging to him. SA Gosnell retrieved the phone from the center console of the Nissan. The phone was seized as evidence.

S.     The passenger was later identified as Rodolfo MANJARREZ-LOPEZ (DOB: 05/16/1989). MANJARREZ-LOPEZ was the passenger in the Nissan Sentra. MANJARREZ-LOPEZ exited the Sentra and entered the driver's seat of the Kia Soul. MANJARREZ-LOPEZ lifted the floor mats of the Kia Soul in what appeared to be an attempt to locate the key to the vehicle. GONZALEZ only communicated to Juan LNU through the "Threema Application" regarding where he had placed the key. MANJARREZ-LOPEZ was in possession of a large amount of U.S. currency in his right front jacket pocket. (Later determined to be $4,000 dollars in US currency in assorted bills). MANJARREZ-LOPEZ was in possession of a large amount of U.S. currency in his front left jacket pocket (Later determined to be $182 dollars in US Currency in assorted bills). MANJARREZ-LOPEZ was also in possession of two iPhones at the time of his arrest. A black in color iPhone was in the center console of the Kia Soul when MANJARREZ-LOPEZ was taken into custody and a second blue in color iPhone 12 Pro was on MANJARREZ-LOPEZ's person at the time he was taken into custody. The black in color iPhone located in the Kia Soul had MANJARREZ-LOPEZ's Mexican identification card in it.

T.      BAUTISTA-ALANIS and MANJARREZ-LOPEZ were transported to the Lakewood Police Department. BAUTISTA-ALANIS was uncooperative and was unwilling to speak with agents. Law enforcement requested consent to search BAUTISTA-ALANIS's cell phone. BAUTISTA-ALANIS denied consent. BAUTISTA-ALANIS missed a phone call from an individual identified as "CACHA SONORA" phone number (720) 678-6192 while in custody.

U.      Law enforcement spoke to MANJARREZ-LOPEZ. MANJARREZ-LOPEZ was advised of his Miranda Rights. MANJARREZ-LOPEZ waived the right to have an attorney present and agreed to answer questions. MANJARREZ-LOPEZ stated he was helping a friend in Mexico. MANJARREZ-LOPEZ identified the friend as Juan CESAR. MANJARREZ-LOPEZ stated he met Juan CESAR in Nayarit, Mexico. MANJARREZ-LOPEZ stated Juan CESAR currently lived in Guadalajara, Mexico. MANJARREZ-LOPEZ advised he received a call from Juan CESAR asking him to pick up the Kia Soul and drive it to a mall in Aurora, CO. MANJARREZ-LOPEZ explained he agreed to pick up the vehicle and take it to Aurora. MANJARREZ-LOPEZ provided Mexico phone number 52-331-397-3070 as belonging to Juan CESAR. MANJARREZ-LOPEZ stated Juan CESAR told him where to pick the vehicle up. MANJARREZ-LOPEZ denied any knowledge of drugs being in the vehicle. HSI agents requested consent to search MANJARREZ-LOPEZ's phones. MANJARREZ-LOPEZ denied consent. Law enforcement learned MANJARREZ-LOPEZ also uses the identity of Elder LUNA-RODRIGUEZ D.O.B. 08/18/1989- A#200673629. MANJARREZ-LOPEZ had a criminal history for a previous arrest by the Unified Police Department of Greater Salt Lake City, UT. MANJARREZ-LOPEZ was charged with distribution of a controlled substance. On May 11,2010 MANJARREZ-LOPEZ under his

alias (LUNA-RODRIGUEZ) was convicted in the 3rd District Court, Salt Lake, Salt Lake

County, State of Utah for the offense of Distribute/offer/arrange distribution of controlled

substance, to wit: Cocaine, in violation of Utah Criminal Code 58-37-8 (1)(A)(II), a 2nd

Degree Felony. MANJARREZ-LOPEZ was sentenced to prison in the Utah State Prison.

18.     Based on my training and experience, I know that illegal narcotics are typically

transported from southwestern states to cities throughout the United States.  Typically, the

further the narcotics are transported into the United States, the more the value increases.  Drugs

proceeds are frequently then transported back to these source locations.  Illegal drugs are

typically found in vehicles traveling eastbound and drug proceeds are typically found in vehicles

traveling westbound.

19.     The Device(s) were in MANJARREZ-LOPEZ's possession at the time of his

arrest and were seized incident to arrest.  The Device(s) are presently secured at the HSI RAC

Office in Grand Junction, Colorado.

20.     Based on the foregoing affidavit and my knowledge and experience, I believe that

Rodolfo MANJARREZ-LOPEZ and Ariel BAUTISTA-ALANIS traveling to "Mariscos el Rey"

located at 6026 W Alameda Avenue Lakewood, CO (predesignate location) and attempting to

take the Kia Soul (CA- 8MHD540) containing a sophisticated aftermarket manufactured

compartment  containing methamphetamine into their possession indicates that they are involved

with a major national and/or international drug trafficking organization.

21.     Transporters of large amounts of illegal narcotics are usually in constant contact

with co-conspirators and distributors at the destination or embarkations of the controlled

substance.  Communication between transporters, distributors, and co-conspirators are usually

maintained through telephone calls or text messages.  In my experience, transporters of

contraband/currency often do not know their destinations and receive instructions to arrive at the necessary location to deliver the contraband while en route. Such communications, as well as photographs, documents, and other records, are valuable in aiding investigators in identifying co-conspirators and/or locations containing additional evidence of the offenses.

22.     In addition, in my experience, those involved in the trafficking of drugs will use GPS and cell tower-based tracking devices to track the transporters of their narcotics to protect their illicit cargo. Some of these devices send instant details to the user's cell phone or computer so that the whereabouts of their contraband is known at all times. Therefore, the GPS or cell tower-based tracking device would likely contain evidence as to the routes used, locations of stops and telephone numbers associated with the device. Information relating to whom the tracking device/cellular telephone is registered to would lead to evidence showing who was monitoring the trafficked narcotics or conspiring with the courier.

23.     Finally, in my experience, cellular phone devices in the possession of drug traffickers often contain information about co-conspirators, including social media accounts and contacts, e-mail accounts and contacts, Skype chats and contacts, photographs, financial accounts, financial log books, and browser history. In addition, in my experience, drug couriers often make multiple trips. A search of the cellular phone device could provide information on travel history through hotel reservations confirmation e-mails and route searches through websites such as Google Maps. Financial information related to these activities may aid in identifying others involved in these offenses, as well as provide information on methods and means of transporting or laundering any drug proceeds.

## CONCLUSION

24.     Based on the investigation described above, probable cause exists to believe that inside the Device(s) (described on Attachment A), will be found evidence, fruits, and instrumentalities of a violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A)(viii) – Possession with Intent to Distribute methamphetamine (described in Attachment B).

25.     I, therefore, respectfully request that the attached warrant be issued authorizing the search and seizure of the items described in Attachment A for the items listed in Attachment B.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

_____/s Shane Gosnell_____
Special Agent
Homeland Security Investigations

Subscribed, attested to, and acknowledged by reliable electronic means on May _____19____, 2021.

_____
Gordon P. Gallagher
United States Magistrate Judge

Application for search warrant was reviewed and is submitted by Pete Hautzinger, Assistant United States Attorney.

**ATTACHMENT A**

**DESCRIPTION OF LOCATION TO BE SEARCHED**

Two Apple iPhone cellular telephones one described as a black in color Apple iPhone cellular telephone and one described as a blue in color apple iPhone cellular telephone (hereinafter and in Attachment B the "Device(s)").  The Device(s) are presently secured at the Homeland Security Investigations Office in Grand Junction, Colorado.

## ATTACHMENT B

## DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED

For the Device(s) listed and described in Attachment A, the following items, that constitute evidence of the commission of, contraband, the fruits of crime, or instrumentalities of Title 21, United States Code, Section 841(a)(1):

1.     Information, notes, software, documents, records, or correspondence, in any format and medium, pertaining to violations of Title 21, United States Code, Section 841(a)(1);

2.     Information, notes, software, documents, records, photographs, videos, or correspondence, in any format or medium, pertaining to purchasing, possessing, and/or transporting controlled substances;

3.     Information, notes, software, documents, records, photographs, videos, or correspondence, in any format or medium, pertaining to types, amounts, and prices of controlled substances trafficked, as well as dates, places, and amounts of specific transactions;

4.     Photographs and video of associates, property, or other items related to controlled substance, including embedded data within those items;

5.     Address books, names, and lists of names and addresses of individuals who may have been contacted by use of the Device(s) or by other means for the purpose of committing violations of Title 21, United States Code, Section 841(a)(1);

6.     Stored names, telephone numbers (including numbers from outgoing, incoming, and missed call lists), and e-mail addresses, if applicable; contact lists; records of telephone calls placed, and any other part of the electronic memory of the Device(s) which contains information relating to violations of Title 21, United States Code, Section 841(a)(1);

7.     Stored voice-mail, text, and e-mail messages relating to controlled substances;

8.     Information, notes, software, documents, records, photographs, videos, or correspondence, identifying or involving controlled substance customers or suppliers;

9.     Information, documents, records, photographs, videos, or correspondence, in any format or medium, pertaining to use or ownership of the Device(s), or that aid in the identification of persons involved in violations of Title 21, United States Code, Section 841(a)(1);

10.    Information, records, documents, invoices and materials, in any format or medium, that concern any accounts with an Internet Service Provider pertaining to violations of Title 21, United States Code, Section 841(a)(1);

11.    Records, in any format or medium, relating to or showing use of any peer-to-peer network, such as You-Tube, Facebook, Twitter, and related social networking pages pertinent to violations of Title 21, United States Code, Section 841(a)(1);

12.    Records of Internet activity, including Internet Protocol addresses, firewall logs, transactions with Internet hosting providers, co-located computer systems, cloud computing services, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses pertaining to violations of Title 21, United States Code, Section 841(a)(1), or that show who used, owned, possessed, or controlled the Device(s);

13.    Bank records, checks, credit card information, bills, account information, payment records, and other financial records pertaining to violations of Title 21, United States Code, Section 841(a)(1);

14.    Records or descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to violations of Title 21, United States Code, Section 841(a)(1);

15.    Location information, including origin, destination, and any intervening stops, and their associated addresses, pertaining to travel involving violations of Title 21, United States Code, Section 841(a)(1);

16.    Evidence of who used, owned, or controlled the Device(s) to commit or facilitate the commission of the crimes described, or at the time the things described in this warrant were created, edited, or deleted, including photographs, videos, logs, call logs, phonebooks, address books, contacts, IP addresses, registry entries, configuration files, saved usernames and passwords, documents, calendars, browsing history, search terms, metadata, user profiles, e-mail, e-mail contacts, messages (text or voice), instant messaging logs, file structure and correspondence;

17.    Evidence of software that may allow others to control the Device(s), such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security provisions or software designed to detect malicious software or unauthorized use of the device, and evidence of the lack of such malicious software;

18.    Evidence of the attachment to the Device(s) of other storage devices or similar containers for electronic evidence;

19.    Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device(s);

20.    Evidence of how and when the Device(s) were used or accessed to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

21.     The telephone number, ESN number, serial number, and/or SIM card numbers of or contained in the Device(s);

22.     Passwords, encryption keys, and other access devices that may be necessary to access the Device(s); and,

23.     Contextual information necessary to understand the evidence described in this attachment.

**DEFINITIONS**:

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).